IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:08-CR-60 |
| | ) | (VARLAN/SHIRLEY) |
| EMMANUEL J. MOORE, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court, as may be appropriate. The Defendant is charged in a two-count Indictment [Doc. 1] with: (1) knowingly, intentionally, and without authority, possessing with the intent to distribute five grams or more of a mixture and substance containing a detectable amount of cocaine base, a Schedule II controlled substance and (2) knowingly possessing a firearm, a Taurus model PT145, .45 caliber semi-automatic pistol, in furtherance of the drug trafficking crime. This case is before the Court on the Defendant's Motion to Suppress [Doc. 13], which contends that statements and physical evidence obtained during a traffic stop should be excluded because the Defendant's constitutional rights were violated during the traffic stop. The Government responds that the stop was lawful and that the Defendant consented to the search of his person or, in the alternative, the officers had reasonable suspicion to support a Terry frisk of his person. [Doc. 15.] The Government maintains that all statements were voluntary and are admissible.

The parties appeared before the Court for a motion hearing on September 15, 2008. Assistant United States Attorney David Lewen ("AUSA Lewen") was present representing the Government. Attorney Paula Voss ("Attorney Voss") represented the Defendant, who was also present. The Court heard the evidence presented and the arguments of the parties on the motion. The parties were allowed to file supplementary post-hearing briefs. The Defendant filed his Supplemental Memorandum in Support of the Motion to Suppress [Doc. 18] on September 17, 2008, and the Government filed the United States of America's Response to Defendant's Post-Hearing Supplemental Memorandum [Doc. 19] on September 19, 2008. Thus, the Court took the motion under advisement on September 20, 2008.

## I. FACTS

At the hearing, the Government called Knoxville Police Officer David Roncska ("Officer Roncska"). Officer Roncska testified that on February 22, 2008, he was involved in a traffic stop in the Walter P. Taylor Homes, a subsidized housing development, and described the stop to the Court. At approximately 11:45 p.m., Officer Roncska testified he stopped the automobile in which the Defendant was riding just beyond the corner of Kenner Street and McConnell Street because the Defendant, the automobile passenger, was not wearing his seat belt. Officer Roncska said he noticed the seat belt violation because there was a great deal of artificial light in the area and he could see that the locking mechanism was up. Officer Roncska was wearing a microphone during the stop, and his police cruiser was equipped with a video camera which filmed the stop. Officer Roncska verified that the DVD submitted at the hearing included the audio and video collected by his microphone and video camera, and the Court admitted the DVD as **Exhibit 1** to the hearing.

Officer Roncska next described the area in which the stop occurred. He stated that

2

he had worked in the area for approximately three years at the time of the stop and knew it to be a "high crime area," and that he had responded to "countless calls" in the area—the majority of which involved narcotics, weapons, or violent crimes.

Upon seeing the seat belt violation, Officer Roncska stated he turned on his blue lights and the car pulled over to the side of the road. Almost immediately after initiating the stop, Officer Richard Wallace ("Officer Wallace") came to the scene to serve as back-up for Officer Roncska. Officer Roncska approached the driver side window while Officer Wallace approached the passenger side window. Officer Roncska said that the driver Edward Bailey ("Mr. Bailey") appeared to be nervous and he could see the Defendant in the passenger seat, who appeared to be extremely nervous. Officer Roncska stated that both occupants were more nervous than persons normally are during a traffic stop. He described the Defendant's nervousness which was manifested through the Defendant's looking around rapidly, a tightened torso, rigid arms and hands, heavy breathing, and tapping of his feet on the floorboard. Officer Roncska said that based on his experience the nervousness indicated to him that possibly other criminal activity was going on.

Officer Roncska asked Mr. Bailey if he could search the car. Mr. Bailey, according to Officer Roncska, hesitated and then asked why Officer Roncska wanted to search, and Officer Roncska replied that it was just a question. Mr. Bailey thereafter consented to a search of the vehicle. Instead of searching at that time, Officer Roncska obtained Mr. Bailey's driver's license and the Defendant's driver's license from Officer Wallace. He returned to the cruiser to check the validity of the licenses and car registration, conduct an NCIC check, and call for additional information. Officer Roncska also called for a K-9 Unit. Officer Roncska testified that while behind the car he witnessed the Defendant attempting to open the car door which Officer Roncska felt was

3

in disobedience to his directions to stay in the car. He then stated Officer Wallace prevented Defendant from getting out of the car and his purported attempt to exit. Officer Roncska stated that the K-9 Unit arrived at the scene before he had completed his records research.

Officer Roncska said he then approached the driver side of the automobile and asked Mr. Bailey to exit the automobile. Almost simultaneously, Officer Wallace asked the Defendant to exit the automobile. Officer Roncska testified that he requested the occupants exit the vehicle in order to protect both the officers' safety and the passengers' safety while the K-9 did a perimeter search of the vehicle. After Mr. Bailey exited the vehicle, Officer Roncska patted him down; Officer Roncska testified that the patdown was also a safety measure due to the heightened level of nervousness exhibited. Officer Roncska testified that Officer Wallace asked the Defendant to exit the vehicle, and asked Defendant if there was anything illegal on him and the Defendant paused before he answered. Officer Wallace asked if he could search the Defendant, and the Defendant said either "go ahead" or "yes." The search of the Defendant revealed a .45 caliber gun and what Officer Roncska considered to be a trafficking quantity of cocaine.

Officer Roncska testified that he commented to Officer Wallace that the gun was "a very nice weapon," to which the Defendant responded, "You know where I work," and indicated he worked security for the IGA. Officer Roncska conceded that at this time the Defendant was in custody but had not yet been informed of his <u>Miranda</u> rights. The Defendant later requested that his handcuffs be loosened. Officer Roncska said he complied with the request but warned the Defendant that the K-9 would be released if the Defendant attempted to run. Officer Roncska indicated that this was merely a statement, not a question, and he expected no response. Nonetheless, he testified that the Defendant then stated, "I'm not going to run. You all got me; it

4

was in my pants." Finally, Officer Roncska testified that the total stop lasted approximately seven minutes.

On cross-examination, Officer Roncska elaborated on the moments immediately before and at the beginning of the stop. He stated that he was leaving another call and observed the seat belt violation as the car in which the Defendant was riding turned in front of him onto Kenner Street. The automobile was slowing, but Officer Roncska said that he did not know if the car was approaching the Defendant's residence. Officer Roncska testified that he had never stopped the Defendant before and did not recognize or know the Defendant.

Officer Roncska affirmed that he wrote a statement summarizing the events of the stop, which was admitted as **Exhibit 2** to the hearing. Officer Roncska admitted that people are often nervous, at least to some degree, when they are stopped for a traffic violation, but he maintained that the Defendant displayed more than an average level of nervousness. Officer Roncska conceded that Defendant's mannerisms could be attributed to causes other than nervousness, but he stated that both his personal experience and training indicated to him that the Defendant might be armed and engaging in criminal activity and that was his perception of those indicators. Officer Roncska admitted that he did not see any contraband in the car nor did he smell drugs upon approaching the car.

On further cross-examination, Officer Roncska also expanded upon his prior testimony regarding the exchange between the officers and the Defendant and Mr. Bailey. After Officer Roncska obtained Mr. Bailey's driver's license, he asked Mr. Bailey if he was related to Jesse Bailey, a person the officer was aware had previous criminal violations. Mr. Bailey was not related to Jesse Bailey. Officer Roncska admitted that the Defendant may have needed to open the

5

car door to give his driver's license to Officer Wallace, but Officer Roncska said he thought the door was open prior to Officer Wallace approaching the car. Officer Roncska admitted that he asked Mr. Bailey twice whether he could search the car, but Officer Roncska maintained that he asked a question and did not give a command or coerce Mr. Bailey. During this time the Defendant seemed extremely nervous. Officer Roncska conceded that he did not advise Mr. Bailey of his right to refuse a search but his response seemed evasive. After officer Wallace obtained the Defendant's identification, he handed it to officer Roncska who ran the license while Officer Wallace remained by the passenger side door. Officer Roncska confirmed the occupants were not free to leave until he wrote the citation. He further complained there were no warrants indicated during the records check. He explained his patdown of Mr. Bailey, the driver, and his officer-safety concerns due to the location being a very violent area and the time, as the area became extremely violent at night. Mr. Bailey was placed in the patrol car for safety. Officer Roncska also said that, thereafter, Officer Wallace asked the Defendant if he had anything illegal on him and the Defendant replied in an odd manner. The Defendant put his hands upon the car and replied "No" but then asked "Who me?," and then consented to be searched by stating "yeah go ahead." However Officer Roncska admitted the Defendant was going to be patted down anyway.

On redirect, Officer Roncska affirmed that: the automobile was moving forward when he pulled it over and that he saw the Defendant was not wearing his seatbelt. He also stated he saw the Defendant's door opened after he told the Defendant and Mr. Bailey to remain in the car; and the K-9 Unit arrived prior to his receipt of the records he requested. On recross, Officer Roncska testified that Officer Wallace was behind the passenger side door next to the car while Officer Roncska was in the cruiser and that Officer Wallace conversed with the Defendant while Officer

6

Roncska was in his cruiser.

The Government called as its next witness. Knoxville Police Officer Richard Wallace who testified that he was on patrol that night and behind Officer Roncska when Officer Roncska stopped the automobile in which the Defendant was a passenger for a seat belt violation at approximately 11:45 p.m. on February 22, 2008. Officer Wallace had a microphone on his person during the stop, and his police cruiser was equipped with a video camera. Officer Wallace verified that the DVD submitted at the hearing included the audio and video collected by his microphone and video camera, and the Court admitted the DVD as **Exhibit 3** to the hearing.

Officer Wallace testified that at the time of the stop he was familiar with the Walter P. Taylor Homes because he had been patrolling the eastside of Knoxville for approximately two and a half years. He stated that it was a high crime area with a high rate of drug use and that these problems escalated as it got later in the evening or night. Officer Wallace noted he had responded to three to four calls per shift for crimes including suspicious person, drug dealing, guns, domestic matters, shootings, and stabbings.

Officer Wallace explained that after the automobile stopped he approached the passenger side; he believed the passenger side window was up when he approached the car. The Defendant seemed very nervous– more so than people usually were for seat belt violations. Officer Wallace described the Defendant's nervous mannerisms as including: rapid breathing, moving his head and looking around, having his hands in his lap, shaking, and tapping his feet on the floorboard. Officer Wallace recognized the Defendant from prior burglary calls he had answered at the IGA grocery store. The Defendant worked as security personnel at the store. The Defendant gave his driver's license to Officer Wallace, who passed it to Officer Roncska.

7

While Officer Roncska was in the cruiser checking records, Officer Wallace positioned himself behind the passenger door. He confirmed Officer Roncska told Defendant and the driver to stay in the car, but that Defendant pushed the door open in a manner that appeared intentional to Officer Wallace. It appeared to Officer Wallace that the Defendant might run so he stood by the door to stop him. He then engaged the Defendant in conversation to ease the initial tension of the stop, and the two discussed the IGA burglaries. The K-9 Unit arrived, and Officer Wallace said he asked the Defendant to step out of the car. The Defendant stepped out, and Officer Wallace asked if the Defendant had anything illegal on him. Officer Wallace said the Defendant hesitated in a manner he described as abnormal and then responded, "Huh . . . nah." Officer Wallace then asked the Defendant for consent to search his person. Defendant said "Yeah, go ahead," and put his hands up. During the search of the Defendant, Officer Wallace found a loaded hand gun and cocaine and marijuana in his pockets.

On cross-examination, Officer Wallace testified that when the car was first pulled over he did not know the reason the car was being pulled over. He learned why the stop had been initiated when Officer Roncska told the driver. Officer Wallace could did not see anything in the car and could not remember whether the automobile's engine had been turned off when the car stopped, but he thought that the passenger side window was up when he approached the car. Officer Wallace recalled that Officer Roncska asked the Defendant to give his identification to Officer Wallace, and the Defendant opened the door to do so. Officer Wallace affirmed he stood by the door and the Defendant was not free to leave at that time. He also affirmed that the conversation with the Defendant was comfortable and included joking. Officer Wallace admitted that he did not see any drugs or guns in the car. He testified that after the driver had gotten out of the car, he told the

Defendant to get out, because of the arrival of the K-9 officer. He then asked the Defendant for permission to search, but the Defendant did not immediately consent to a search of his person. Officer Wallace did not believe he asked the Defendant for consent twice, and the Defendant did say, "Yeah, go ahead."

After the Government rested, the Defendant testified on his own behalf. He testified that Mr. Bailey turned off the automobile after it was pulled over, so his window would not roll down. He had to open his door to give his driver's license to Officer Wallace. The Defendant said he spoke with Officer Wallace about events in the neighborhood for several minutes. When Officer Roncska returned from the cruiser, the Defendant saw Mr. Bailey exit the car but could not see where he was taken. Thereafter, the Defendant said he was ordered out of the car by Officer Wallace. After exiting the car, Officer Wallace asked the Defendant if he could search him, and though the Defendant did not want him to, he felt he had no choice. The Defendant said that Officer Wallace was right beside him and was already touching him and told him to put his hands on top of the car. The Defendant felt Officer Wallace was going to search him regardless of what he said.

On cross-examination, the Defendant reiterated that he opened the door in order to hand Officer Wallace his identification but denied pushing it open later to get out. The Defendant admitted that this traffic stop was not his first interaction with the Knoxville Police Department. When asked whether he knew what he could and could not do during a stop with the Knoxville Police Department, the Defendant replied in the affirmative but added that the officers were going to search people anyway. He also testified on redirect that no one told him he could say no to the request to search.

## II. FINDINGS OF FACT

The Court found Officer Roncska, Officer Wallace, and the Defendant's testimony at the hearing to be credible. At the hearing, the Defendant testified regarding his perception that he had no choice but to consent to the search. The Defendant did not dispute the officers' descriptions of the events except to the extent that he stated he only opened the door to give Officer Wallace his identification and talk to Officer Wallace not to flee. Thus, the Court has based the sequence and description of events on the officers testimony generally and has weighed the testimony of the Defendant against the officers' testimony where the two renditions conflict.

The cruiser DVDs contain sound recordings that provide fairly precise records of what was said during the stop, so the Court consulted both the DVDs and the testimony at the hearing when it determined the dialogue between the Defendant, Mr. Bailey, and the officers. Finally, there was extensive testimony at the hearing and briefing from the parties about the events that preceded the Defendant being handcuffed, but the events and dialogue that occurred after the patdown were not described as extensively. Therefore, the Court relied on the cruiser DVDs for a portion of its findings regarding the later events. Based upon the testimony at hearing, the parties' memoranda, and the Court's review of the recordings from the officers' cruisers, the Court finds the following facts:

At approximately 11:47 p.m.,[1] on February 22, 2008, Officer Roncska observed a car in which the Defendant was riding and observed that the Defendant was not wearing a seat belt. Officer Roncska then stopped the vehicle for the purpose of issuing a citation for Defendant's failure

---

[1] The time stamps on the officers' recordings do not synchronize. Officer Wallace's recording of the stop [Exhibit 3] begins at approximately 23:28:15, but Officer Roncska's recording of the stop [Exhibit 1] begins at approximately 23:47:20. Officer Roncska's recording is higher quality and us consistent with the testimony in court and appears to be the more accurate measure of the time line.

to wear a seat belt. The stop occurred in Walter P. Taylor Homes, a subsidized housing project. Officer Wallace, who was also on patrol that night, almost immediately arrived as back-up for Officer Roncska. Officer Roncska approached the driver's side of the automobile, and Officer Wallace approached the Defendant's side of the automobile. Both officers perceived the vehicle's occupants, Mr. Bailey and the Defendant, to be nervous, and the Defendant appeared especially nervous. The Defendant had his hands in his lap and had a tightened torso. He was breathing rapidly, moving his head and looking around, shaking, and tapping his feet on the floorboard. The officers asked both occupants for identification, and the Defendant opened his door to hand Officer Wallace his identification.

While Officer Roncska ran a records check on the car's registration and both occupants, Officer Wallace stood by the passenger side door and conversed with the Defendant about various crimes in the community and the IGA grocery store. [Ex. 3 at 23:30:52-23:30:45]. The two joked about the effect not selling beer and cigarettes would have on the IGA grocery store's business and the possibility of another criminal suspect pursing a career in rap music. [Ex. 3 at 23:31:57 and 23:33:40]. After approximately five minutes of discussion, the K-9 Unit that had been called at the beginning of the stop arrived at the scene to sniff the car's exterior. [Ex. 3 at 23:34:00].

Officer Roncska returned to the car and told Mr. Bailey, the driver, to step out of the car, so that the K-9 could sniff the car. Officer Wallace asked the Defendant if he had anything illegal on his person to which the Defendant responded, "Huh? . . . nah." [Ex. 3 at 23:34:52]. Officer Wallace then asked the Defendant to step out of the car and asked "Can I search real quick?"

11

Defendant responded, "I mean sh– . . . I ain't." [Ex. 3 at 23:34:56]. Officer Wallace asked again,[2] to which the Defendant responded, "Yeah, go ahead." [Ex. 3 at 23:34:59]. The search of the Defendant's person rendered 0.7 grams of marijuana, 23.1 grams of cocaine base, and a loaded 0.45 semi-automatic pistol among other items.

After Officer Wallace frisked the Defendant, he sat the cocaine and gun that he found on the Defendant on top of Mr. Bailey's automobile. Officer Wallace proceeded to place handcuffs on the Defendant approximately seven minutes after the stop began. The Defendant said "Aww, you're squeezing my finger," to which the officers responded that the Defendant was tough and would be alright. [Ex. 3 at 23:35:54]. The Defendant the replied, "Lemme . . . sh– I ain't going to run from you . . . I deal with y'all on a daily basis." [Ex. 3 at 23:36:00]. The officers responded, "We don't know that." [Ex. 3 at 23:36:03]. Then, Officer Roncska commented, "Eww, that's a nice gun." [Ex. 1 at 23:55:19]. Defendant responded, "Sh– I work . . . you already know where I work . . .security for the store." [Ex. 3 at 23:36:16].

The officers discussed paperwork among themselves while the Defendant called to someone in the distance to tell his girlfriend to come to the scene. Officer Roncska asked Officer Wallace, "What'd, he have the pistol in his pants?" [Ex. 3 at 23:36:54]. Officer Wallace began to explain that the gun was in a holster on the Defendant's hip, but the Defendant interjected, "It was on my hip." [Ex. 3 at 23:36:56]. Thereafter, the Defendant was placed in a police cruiser, while the officers searched Mr. Bailey's vehicle.

---

[2]Officer Wallace testified that he did not think he asked twice for permission. The DVD reveals that he did ask twice, but given the time between the events and the hearing, the Court does not believe this contradiction weighs on Officer Wallace's credibility.

12

# III. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. The Defendant contends that his rights under the Fourth Amendment were violated because: (A) the officers did not have reasonable suspicion to extend the search beyond writing a citation for the seat belt violation or to search the Defendant's person and (B) the Defendant was not informed of his <u>Miranda</u> rights prior to questioning. The Defendant moves to suppress both the physical evidence discovered during the search of his person and his statements to officers after being detained. The Court will consider each of these contentions in turn.

## A. The Search

Officers Ronscka and Wallace stopped the vehicle in which the Defendant was a passenger for the Defendant's failure to wear a seat belt. Defendant contends that the stop resulted in an unreasonable delay and an unreasonable search of the Defendant. The Government argues that the officers had both reasonable suspicion and consent to search the Defendant's person.

### 1. Reasonable Suspicion

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." <u>Whren v. United States</u>, 517 U.S. 806, 809-10 (1996); <u>Delaware v. Prouse</u>; 440 U.S. 648, 653 (1979). However, the seizure of the vehicle "is reasonable where the police have probable cause to believe that a traffic violation has occurred." <u>Whren</u>, 517 U.S. at 810.

13

"[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."  Pennsylvania v. Mimms, 434 U.S. 106, 111 & n. 6 (1977); United States v. Burton, 334 F.3d 514, 519 (6th Cir. 2003).  Thus, generally the officer can detain the person while the officer completes a records check and issues a citation, see United States v. Wellman, 185 F.3d 651, 656 (6th Cir. 1999), but "once the purpose of an ordinary traffic stop is completed, the officer may not 'further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention.'"  United States v. Perez, 440 F.3d 363, 370 (6th Cir. 2006) (quoting United States v. Mesa, 62 F.3d 159, 162 (6th. Cir. 1995)).

To determine whether reasonable suspicion existed, a reviewing court must "look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."  United States v. Arvizu, 534 U.S. 266, 273 (2002).  This standard is designed to allow "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"  Id. (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)).

Even if an officer has reasonable suspicion to extend a stop, the officer does not automatically have the authority to perform a protective patdown of the suspect who has been stopped.  See Bennett v. City of Eastpointe, 410 F.3d 810, 824 (6th Cir. 2005).  During the stop, the officer may conduct a "reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual . . . ."  Terry v.

<u>Ohio</u>, 392 U.S. 1, 9 (1968). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." <u>Terry</u>, 392 U.S. at 27. "[U]nless the officer points to specific facts that demonstrate reasonable suspicion that the individual is armed and dangerous, the Fourth Amendment tolerates no frisk." <u>Bennett</u>, 410 F.3d at 824.

In the present case, the Defendant does not dispute that Officer Roncska had probable cause to pull the automobile over for the seat belt violation. The Defendant contends that the stop and the accompanying search extended beyond the scope necessary to issue a seat belt violation citation and, therefore, became an unreasonable search and seizure. Less than seven minutes elapsed between the time the automobile pulled over and the search of the Defendant's person and the search occurred before Officer Roncska had received the records he requested, so there is no question that the search was not extended beyond the time necessary to complete the citation.

Defendant also argues that there was not reasonable suspicion to believe the Defendant was armed and dangerous so as to allow a <u>Terry</u> patdown. The Government identifies four factors which the officers based their reasonable suspicion for a <u>Terry</u> patdown on: the late hour, the location in a high crime area, the Defendant's nervousness, and the Defendant's failure to obey officer instructions.

Both the late hour and the high rate of crime in the area contribute to a determination of reasonable suspicion. <u>See</u> <u>Watkins v. City of Southfield</u>, 221 F.3d 883 (6th Cir. 2000) (finding reasonable suspicion where the defendant was driving in the early morning in a high crime area known to the officers and at about half the allowable speed limit). However, neither factor alone clearly or definitively establishes reasonable suspicion. First, the Defendant contends that the hour

15

was not a "late hour" for purposes of reasonable suspicion. The lateness of the hour is typically considered in evaluating stops that occur in the early morning such as 1:00 a.m., and the Sixth Circuit Court of Appeals has held that 10:30 p.m. is "an hour not late enough to arouse suspicion of criminal activity." United States v. Blair, 524 F.3d 740, 751 (6th Cir. 2008). This stop was made at approximately 11:45 p.m. While the hour is not in the early morning, the Court finds it is more akin to early morning stops made at 1:00 a.m. than those made at 10:30 p.m.

An area's high crime rate can also contribute to reasonable suspicion. An individual's presence in an area of frequent criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. Brown v. Texas, 443 U.S. 47, 52 (1979). "But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." United States v. Wardlow, 528 U.S. 119, 124 (2000). Officers Roncska and Wallace have both testified to the frequency of violent crime and drug-related crime in the Walter P. Taylor Homes, and Officer Wallace testified regarding his particular experience with violent and drug related class in the area. In addition, numerous cases that originated in this District have recognized the high rate of crime in the Walter P. Taylor Homes. See United States v. Muckle, 2008 WL 400444, at *2 (6th Cir. 2008) (noting officer's testimony that Walter P. Taylor Homes is a high crime area); United States v. McCreary-Redd, 475 F.3d 718, 720 (6th Cir. 2007) (describing Knoxville Police Department surveillance of the housing project due to complaints of drug activity). The Court finds that the stop was made in a high crime area but reiterates that this factor must be coupled with additional evidence of the circumstances to support a finding of reasonable suspicion.

Nervous, evasive behavior is also pertinent to determining reasonable suspicion,

United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975), but "nervousness is generally included as one of several grounds for finding reasonable suspicion and not a ground sufficient in and of itself." Mesa, 62 F.3d at 162. In the present case, the officers testified that the Defendant appeared nervous because he was: breathing rapidly, looking around, clutching his hands in his lap, and tapping his feet on the floorboard. The Court finds that these observations taken together are too subjective to support reasonable suspicion especially given the conversation that occurred just moments after the observations.

Officer Wallace's cruiser audio recording reveals that after Officer Roncska took the Defendant and Mr. Bailey's identifications back to his cruiser Officer Wallace and the Defendant engaged in a lengthy conversation about the IGA grocery store—its proximity to the Defendant's home, its recent break-ins, and its decision to no longer stock beer and cigarettes—and recent crime in the area. The two even joked about the effect not selling beer and cigarettes would have on the store's business and the possibility of another criminal suspect pursing a career in rap music. The cordial interaction between the Defendant and Officer Wallace undermines subjective reports that the Defendant appeared nervous.

Finally, Officer Roncska testified that the Defendant attempted to exit the automobile after being told to remain inside. Officer Roncska said he saw the Defendant's door open and thought that the Defendant might be attempting to escape the vehicle; Officer Wallace confirmed such. At the hearing, neither officer could remember whether the automobile was turned off after it was stopped. The Defendant testified that the automobile was turned off at the beginning of the stop and he had to open the passenger side door to give Officer Wallace his identification. The Defendant testified that the door remained open so that he and Officer Wallace could converse.

17

The videos from both officers' cruisers [Exhibits 1 and 3] very clearly show that Mr. Bailey turned off his automobile after being stopped—the roaring engine heard at the beginning of the stop ceases. Thus, the Defendant would have had to open his door in order to comply with the request that he give his identification to Officer Wallace. Review of the cruiser videos shows no subsequent sudden swinging open of the door or gestures indicating an attempt at escape. All the testimony confirms the Defendant sat and talked to Officer Wallace while Officer Roncska was in the cruiser. Neither officer made any comment or remark about the Defendant's conduct or his attempting to escape on their audio recordings, and it is unlikely that a true attempt to flee would not draw a single comment from officers. The officers' perceptions that the Defendant might have been attempting to flee the automobile are not supported by the evidence. The extent to which the open door may have moved does not appear to support the officers' subjective conclusions.

Based upon the foregoing, the Court concludes there was not a sufficient basis based on the totality of the circumstances for a Terry patdown, as there was insufficient evidence to establish that the officers had reason to believe the Defendant was armed or dangerous. The purported nervousness of the Defendant and the Defendant's alleged attempt to flee are undermined by examining the totality of the circumstances. The remaining circumstances—a high crime area and the late hour—are not sufficient to yield reasonable suspicion that the Defendant was either armed or dangerous. While Walter P. Taylor Homes is a high crime area, this circumstance alone does not support a reasonable suspicion that the Defendant was engaged in criminal activity or was a danger to the officers. The hour in question is late, but not so late that it can contribute strongly to an officer's suspicion. Even considering all of the factors in the totality of the circumstances analysis, the Court declines to find reasonable suspicion. To find otherwise, would be to permit

18

officers to conduct a <u>Terry</u> patdown on anyone in this area around or after midnight who they felt exhibited some aspects of nervousness, without any other evidence that they might be armed or dangerous. Such does not appear to the undersigned, to comport with the <u>Terry</u> requirements.

*2. Consent to Search*

Alternatively, the Government argues that the Defendant consented to the search of his person prior to being frisked. The Defendant maintains that he gave the officers permission to search because he felt an attempt to refuse would be futile. The Defendant argues that his statement was a mere acquiescence to search not voluntary consent.

Despite a lack of reasonable suspicion, a search may be conducted without a warrant if the suspect gives free and voluntary consent. <u>See</u> <u>United States v. Crowder</u>, 62 F.3d 782, 787 (6th Cir. 1995). The government bears the burden of proving by the preponderance of the evidence that valid consent was obtained. <u>Id</u>. "[T]he determination of 'whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.'" <u>United States v. Worley</u>, 193 F.3d 380, 384 (6th Cir. 1999) (quoting <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 227 (1973)). In determining whether voluntary consent was given, "the court should examine, inter alia, the following factors: the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police." <u>Worley</u>, 193 F.3d at 386. An effective consent does not require that the defendant knew he or she had the right to refuse the request to search. <u>Schneckloth</u>, 412 U.S. at 227.

The Defendant cites a number of characteristics of the stop that he believes make his

19

statements involuntary. These include: the presence of two and later three officers and their cruisers, Officer Wallace's close proximity to the Defendant during the stop, his witnessing Mr. Bailey being taken out of the automobile, and Officer Wallace's asking twice for permission to search. Comparing the factors identified in Worley to those identified by the Defendant, the Court concludes that that the evidence does not support a finding that the consent was involuntary. The mere presence of two officers and the addition of a K-9 officer later does not appear to the undersigned to be abnormal for a stop conducted at night, and there is no proof that it was abnormal. Given the light conversation in which the Defendant and Officer Wallace engaged, the Court cannot find that the Defendant was intimidated or coerced by the police presence or subsequent request. Officer Wallace asking arguably twice for permission to search does not amount to repeated or prolonged questioning, and placing his driver Mr. Bailey in the cruiser does not rise to the level of coercing the Defendant. Finally, while the officers failed to give the Defendant a warning regarding his right to decline prior to the search, such a warning is not required, see Ohio v. Robinette, 519 U.S. 33, 39-40 (1996), and the Defendant's age, education, and experience with law enforcement weigh against a finding of coercion based solely upon the lack of warning.

In order for consent to be involuntary, "the defendant must show more than a subjective belief of coercion." Crowder, 62 F.3d at 787. He must show some "objectively improper action on the part of the police." Id. The Defendant has not met this burden. The Defendant's subjective belief that officers were going to search his person regardless of whether the Defendant consented is not a sufficient basis for finding that the consent was involuntary. The Defendant is a twenty-seven year old man with an eleventh grade education, and he has sufficient exposure to law enforcement—both in his personal and professional capacities. During the stop the Defendant

20

discussed recent crime in the area with Officer Wallace including how he addressed criminal incidents as security at the local grocery store. The Defendant admitted at the hearing that this stop was not his first encounter with police officers and that he knew he could respond in the negative to a request for consent to search. Further, there was no evidence at all to support the Defendant's purported subjective belief that the officers were going to search him anyway, nor is there evidence that the belief had any basis in fact or reality.

Based on the foregoing, the Court finds that the Defendant voluntarily consented to a search of his person, and accordingly, Defendant's motion to suppress the physical evidence yielded by the search fails.

## B. Defendant's Statements

Defendant moves the Court to suppress all statements made by the Defendant while he was in custody. The Defendant claims that the officers detained him for an unreasonable amount of time and asked the Defendant repeated questions prior to advising him of his rights under Miranda. The Government maintains that the statements are admissible, despite the lack of Miranda warnings, because the Defendant was not being interrogated.

In Miranda v. Arizona, the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). The duty to give Miranda warnings attaches only where the defendant was both in custody and subjected to interrogation. The Government concedes that the Defendant was in custody after the search of his person. Thus, the only issue before the Court is whether an interrogation took place.

21

An interrogation is "any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). The Court in Innis went on to explain:

> The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.
>
> But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

Id. at 301-02. If a defendant is not subjected to interrogation, any statement he or she makes is considered voluntary, and "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." Miranda, 384 U.S. at 478.

The Court finds that the Defendant was not subjected to interrogation, and therefore, the lack of Miranda warnings prior to the Defendant's admission is not grounds for suppressing the Defendant's statements to the officers. The only questions directed toward the Defendant were preliminary questions that normally accompany an arrest and are not considered to be part of interrogation. See United States v. McConer, 530 F.3d 484, 495 (6th Cir.) (holding that Defendant's statements that he had just gotten out of prison and could not be around guns and drugs were not obtained through interrogation where an officer asked if he lived in an apartment). All the other

comments made by the Defendant were unprovoked and were made when the Defendant interjected himself into conversations that were not meant to provoke responses from him.

Based on the foregoing, the Court finds that the Defendant was not subjected to interrogation while in custody. Therefore, the failure of the officers to give the Defendant Miranda warnings has no effect on the admissibility of the statements Defendant made after being taken into custody. Accordingly, Defendant's motion to suppress his statements fails. The officers did not make statements that were the functional equivalents of questioning, nor express words they should have known were reasonably likely to elicit an incriminating response. For, example, the statements made to the Defendant about running and the K-9 dog would not be considered questions or interrogation nor reasonably likely to elicit an incriminating response like the one made by the Defendant. Likewise the comment on the Defendant's gun made by one officer to the other officer resulted in a spontaneous, unsolicited response from the Defendant.

## IV. CONCLUSION

After carefully considering the evidence introduced during the course of the evidentiary hearing and after reviewing the relevant legal authorities, the Court finds that the Defendant knowingly and voluntarily consented to a search of his person. As a result, the physical evidence discovered in the search of his person should be admissible at trial. Further, the Defendant was not interrogated prior to being advised of his Miranda rights. Therefore, any statements he

made to officers while he was in custody were voluntary and should not be suppressed. Therefore,

it is **RECOMMENDED** that the Defendant's Motion to Suppress [**Doc. 13**] be **DENIED**.[3]

Respectfully submitted,

    s/ C. Clifford Shirley, Jr.

United States Magistrate Judge

---

[3]Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).